UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SANDRA MARIE SELBY,

                         Plaintiff,

         -against-                                    1:14-cv-1066 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                         Defendant.
_____

## DECISION and ORDER

## I.      INTRODUCTION

         This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 8 ("Plaintiff's Brief"); 12 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.     BACKGROUND

         Plaintiff Sandra Marie Selby ("Plaintiff") was born on November 6, 1956.  Dkt. No. 7

("Record") at 193.[1]  Plaintiff has a long history of health issues, including bipolar disorder,

depression, anxiety, panic attacks, agoraphobia, bladder issues, constipation, bone spurs in her feet,

and spinal stenosis in her back.  R. at 178, 181, 191, 270, 298, 454.  Plaintiff also had a

hysterectomy in 1996.  R. at 298.  Plaintiff claims that her medical conditions bar her from all

gainful work activity.  R. at 454.

---

         [1] Citations to the Record refer to the pagination assigned by the SSA.

### A. Psychiatric Conditions

#### 1. Bipolar Disorder/ Depression/ Anxiety

Plaintiff has been diagnosed with anxiety, depression, and bipolar disorder. R. at 178, 180-81, 183, 189-91. Plaintiff underwent monthly treatment with Dr. Fabio L. Urresta ("Dr. Urresta") and Nurse Practitioner Valerie Ramsey-Cummins ("Ms. Ramsey-Cummins") from January 25, 2011 to November 4, 2011. R. at 246. During this period, Dr. Urresta diagnosed Plaintiff with bipolar disorder. R. at 246, 406. Plaintiff was also found to suffer from "[i]rritability, initial insomnia, [and] ruminative thought anxiety." R. at 246. Plaintiff "tends to lose control of her bowels when highly anxious." R. at 248. While Ms. Ramsey-Cummins noted several instances where Plaintiff suffered from anxiety, she also noted on multiple occasions that Plaintiff displayed "no signs of anxiety." R. at 397, 402, 405, 408, 419.

Plaintiff also received care from Nurse Practitioner Gail Casals ("Ms. Casals") from 2007 to 2012. R. at 193, 360. On September 8, 2010, Ms. Casals noted that Plaintiff suffered from anxiety but not depression, and that Plaintiff "is doing well [and] is just having episodic outbreaks of anxiety." R. at 181. On August 11, 2008, Ms. Casals increased Plaintiff's Lexapro dosage to 20 milligrams, and on October 6, 2008, Plaintiff stated that the Lexapro had been working and her anxiety was much improved. R. at 189-90.

#### 2. Panic Attacks/Agoraphobia

Plaintiff suffers from panic attacks and agoraphobia. R. at 270. Dr. Urresta diagnosed Plaintiff with panic attacks and agoraphobia after finding that Plaintiff suffered "panic attacks/intolerable anxiety when attempting to go into public spaces." R. at 246, 406. According to a November 2011 psychiatric questionnaire co-signed by Dr. Urresta and Ms. Ramsey-Cummins,

Plaintiff has suffered from panic attacks and agoraphobia for fifteen years and has only made minimal improvement. R. at 246-47. On June 26, 2012, Ms. Ramsey-Cummins noted that Plaintiff is unable to leave her house except for rare occasions when her daughter accompanies her. R. at 309. Plaintiff testified that she had not been to the market in sixteen years (as of 2012), and that she rarely leaves the house unless driven by her daughter. R. at 42. Even when Plaintiff's daughter picks her up, Plaintiff only feels comfortable in Walmart. Id. Plaintiff testified that she would not have been able to attend her ALJ hearing without taking her medication. R. at 44. Plaintiff stated that she tries to get out of the house "at least once a week" and occasionally drives. R. at 135.

### 3. Suicidal Ideation

On December 1, 2010, Plaintiff told Ms. Casals that she wanted to kill herself. R. at 183. Ms. Casals promptly contacted Four Winds—a mental health facility—and suggested that Plaintiff be hospitalized. Id. Plaintiff was admitted to Four Winds that same day "due to suicidal thoughts with a plan (intentional car accident)." R. at 183, 451. However, other than December 1, 2010, Plaintiff has frequently denied having any suicidal or homicidal ideation. R. at 180, 183, 187, 190-91. Plaintiff was discharged two days later, and upon discharge "denied suicidal and homicidal ideation and was optimistic, future oriented and euthymic." R. at 452.

## B. Physical Conditions

Plaintiff has also suffered, and continues to suffer from, multiple physical conditions. R. at 189, 191, 276. For example, during Plaintiff's physical residual functional capacity ("RFC") assessment on January 12, 2012, Plaintiff claimed to suffer from "arthritis, bowel problems, thyroid nodules, bone spurs and degenerative disc disease." R. at 275, 276, 280. During Plaintiff's RFC

assessment on January 9, 2012, Plaintiff alleged "arthritis, bowel problems, thyroid nodules, bone spurs, and DDD." R. at 270, 273.

### 1. Bladder/Incontinence/Constipation

Plaintiff suffers from occasional bowel incontinence and bladder problems that she contributes to anxiety, in addition to occasional abdominal pain and constipation. R. at 179, 239, 300. Plaintiff saw Dr. Brian P. Murray ("Dr. Murray") on December 21, 2010, and in a letter addressed to Dr. Vincent Corcoran ("Dr. Corcoran"), Dr. Murray explained that while "a cystoscopy . . . show[ed] no abnormalities within the bladder . . . she certainly has bladder instability most likely due to pelvic floor dysfunction." R. at 298. Dr. Murray also stated that Plaintiff had a "history of irritating voiding symptoms and pelvic pain that she has had primarily since hysterectomy in 1996." Id.

### 2. Spinal Stenosis

Plaintiff asserts that "she was diagnosed with spinal stenosis at L4-L5 in her 20s or 30s." R. at 481. On July 23, 2008, Ms. Casals observed that Plaintiff "does have spinal stenosis in her low back and [that Plaintiff was] concerned about whether this could be true of her neck also." R. at 191. An MRI exam of Plaintiff's lumbar spine was performed on August 15, 2008. R. at 212. The MRI exam showed "mild central canal stenosis at L3-4 and moderate to severe stenosis at L4-5, both of which relate to ligamental and facet hypertrophy." Id. Another MRI exam of Plaintiff's lumbar spine was performed on January 6, 2011. R. at 296. This MRI exam showed "multi-level facet joint and ligamentous degenerative hypertrophic changes, most significant in L4-5 which primarily result in borderline spinal canal narrowing." Id. Dr. Luke Vincent Rigolosi ("Dr. Rigolosi") examined Plaintiff on June 5, 2012 in response to complaints of low back and neck pain.

R. at 481. Dr. Rigolosi stated that Plaintiff was "in no acute distress." Id. Plaintiff rose "from a seated position without difficulty," her gait was "non-antalgic and reciprocal," and she could "toe and heel walk." Id. Plaintiff "ha[d] good range of motion of the cervical and lumbar spine in all planes." Id. However, Plaintiff suffered "end-range pain in flexion." Id. Plaintiff's palpation revealed "mild cervical and lumbar spasm and tenderness." Id. Dr. Rigolosi also noted that Plaintiff's thoracocervical spine was properly aligned. Id. While Plaintiff's "cervical spine [had] well- maintained disc height throughout," Plaintiff's "lumbar spine [had] mildly decreased disc height at L5-S1." Id. After the examination, Dr. Rigolosi "recommended chiropractic treatment." Id. Dr. Rigolosi added "[i]f her symptoms persist . . . [t]he next step would be [an] MRI . . . possibly followed by interventional pain procedures." Id.

Plaintiff was also examined by Dr. Joseph Prezio ("Dr. Prezio"), a consultative examiner, on November 3, 2011. R. at 239. Dr. Prezio stated that Plaintiff had "arthritis in all of her bones, bone spurs in her back, and a history of spinal stenosis at L4-L5." Id. However, Dr. Prezio stated that Plaintiff's stenosis did not require surgery. Id. Dr. Prezio, like Dr. Rigolosi, found that Plaintiff "appeared to be in no acute distress." R. at 240. Plaintiff's gait was normal and she could walk on her heels and toes without difficulty. Id. Dr. Prezio found that "[a]s long as her anxiety and depressive state do not overwhelm her, she can handle . . . [c]ooking, cleaning, laundry, shopping, showering, bathing, and dressing." Id. Based on this examination, Dr. Prezio stated "there do not appear to be any significant physical limitations or restrictions noted at the present time." R. at 242.

### 3. Bilateral Cheilectomies

On May 24, 2011, Ms. Casal stated "[Plaintiff] ha[d] pain with palpation over the anterior surface of the forefoot of the right foot. She also has altered sensation in the right great toe as well

5

as the right 2nd toe." R. at 178. On September 9, 2011, Plaintiff had a left cheilectomy with no

apparent complications. R. at 500, 501. On December 9, 2011, Plaintiff underwent a right

cheilectomy, in which "20% of the joint which was significantly eburnated" was removed. R. at

492-93. Plaintiff's surgeon, Dr. David J. Dixon ("Dr. Dixon") noted "[t]he rest of the joint actually

had good range of motion." R. at 493. When Plaintiff saw Dr. Dixon on February 1, 2012, he

observed that Plaintiff "feels some improvement . . . [and] [t]he injection does seem to help." R. at

487. While Dr. Dixon noted Plaintiff seemed to be improving, he also observed that Plaintiff

continued to feel pain. Id. Dr. Dixon further noted that the x-rays "reveal[ed] some degenerative

changes but the alignment . . . [was] actually adequate on the x-rays." Id. On August 7, 2012,

Plaintiff denied suffering joint pain, back pain, or gout. R. at 293. On August 8, 2012, Dr. Dixon

opined that "subsequent to [Plaintiff's] cheilectomy . . . [Plaintiff] continue[d] to have pain, right

side worse than left side." R. at 477. Plaintiff had "quite a bit of stiffness and her pain is quite

debilitating at both first MTP joints." Id. Plaintiff's examination revealed "tenderness and stiffness

to the first MTP joints bilaterally associated with minimal motion." Id. While Plaintiff was

"neurovascularly intact . . . [i]njections and surgical debridements really have not significantly

improved the arthritic changes." Id. In early December 2012, Plaintiff had a joint fusion with local

graft performed on her right great toe. R. at 360, 363, 375, 470, 474. In a post-operation follow up

examination, it was noted that Plaintiff's wounds were healing well with no signs of infection and

no neurovascular complications. R. at 470. Radiographs showed "early healing of that first MTP

joint fusion with intact hardware and excellent alignment." Id.

**C. Impact of Plaintiff's Ailments on Her Ability to Work**

Plaintiff asserts that, due to her physical and mental ailments and complications, she is unable to work. R. at 454. Plaintiff was hospitalized at Four Winds due to concerns about her suicidal tendencies. Id. During her stay, Plaintiff received an integrated assessment. Id. In this assessment, Plaintiff explained that "[s]he has been unemployed for the last 2 1/2 years due to exacerbated symptoms of anxiety and depression" and that she "can't work because she is too depressed." Id. Plaintiff also reported poor concentration and the assessment noted that Plaintiff was "clearly having difficulty during the interview." Id. On January 25, 2011, Ms. Ramsey-Cummins noted "[c]areless mistakes are typical of [Plaintiff's] behavior. She is easily distracted. Work is often left incomplete. [Plaintiff] tends to lose things." R. at 395. Dr. Urresta found Plaintiff unable to "function in [a] work environment" due to Plaintiff's depression, anxiety, panic attacks and bowel incontinence when leaving her home or around people. R. at 251.

Plaintiff also met with Dr. Dennis M. Noia ("Dr. Noia"), a psychologist, on November 3, 2011. R. at 235, 238. At this meeting, Plaintiff stated that she "is unable to work at the present time because of psychiatric problems." Id. While Plaintiff has been diagnosed with bipolar disorder and panic disorder, Plaintiff did not "report any significant symptoms of a formal thought disorder or cognitive dysfunction." R. at 236, 238. According to Dr. Noia, Plaintiff "appears to be capable of understanding and following simple instructions and directions [and] appears to be capable of performing simple and some complex tasks with supervision and independently." R. at 238. Plaintiff also appeared "capable of maintaining attention and concentration for tasks [and] can regularly attend to a routine and maintain a schedule." Id. Plaintiff "appear[ed] to be capable of learning new tasks [and] making appropriate decisions. She appears to be able to relate to and

interact moderately well with others." Id. However, Dr. Noia noted that Plaintiff "appears to be having some difficulty dealing with stress." Id.

Similarly, Plaintiff's mental RFC assessment concluded that "[w]hile there is some support for psychiatric difficulties . . . [Plaintiff] appears to have retained adequate cognitive functioning." R. at 270. The RFC assessment also found that Plaintiff had an adequate Activities of Daily Living Skills ("ADLS") range. Id. The assessment further found that Plaintiff's clinical examination ("CE") "concluded no greater than moderate limitations and some difficulties dealing with stress, but no other limitations are noted." Id.

Plaintiff's case analysis, completed by Edward W. Smith ("Mr. Smith") noted that the "[p]hysical RFC limited her to Light Work." R. at 287. Mr. Smith found that Plaintiff's physical clinical examination "showed normal gait/station; normal heel/toe walk; ability to squat; normal bowel sounds." Id. On May 31, 2011, Dr. Urresta observed that Plaintiff "is friendly, attentive, [and] fully communicative." R. at 406. Dr. Urresta further noted that Plaintiff's "[v]ocabulary and fund of knowledge indicate cognitive function in the normal range." Id. Dr. Urresta found similar results on June 21, 2011. R. at 407-08. Furthermore, Dr. Urresta found that Plaintiff had a Global Assessment of Functioning ("GAF") of 65, which indicates only mild difficulty in social, occupational, and psychological functioning, on several different occasions. R. at 406, 408, 419. Ms. Ramsey-Cummins also noted a GAF of 65 on January 26, 2011 and February 8, 2011. R. at 398, 400. Ms. Ramsey-Cummins noted that Plaintiff did not show signs of anxiety, that Plaintiff's depressive symptoms seemed to be in remission, and that on certain occasions, Plaintiff denied having any anxiety or depressive symptoms. R. at 397, 399, 401-02, 404-05, 408. While Dr. Prezio noted that Plaintiff "has a longstanding history of bipolar issues," he added that these issues "are

being actively managed on a monthly basis." R. at 239. Although it was recommended that Plaintiff "may need a low contact setting, [Plaintiff can] understand and remember instructions and sustain attention and concentration for tasks." R. at 287. Therefore, because Plaintiff's "[m]ental RFC found only mild functional limitations," Plaintiff had the functional capacity to return to her previous work. Id. On August 7, 2012, Plaintiff met with Dr. Murray. R. at 292. At this meeting, Plaintiff denied suffering from depression, anxiety, mental illness, sleep disorders, thyroid problems, chronic constipation, abdominal pain, joint pain, and back pain. R. at 293

### D. ALJ Hearing

On September 1, 2011, Plaintiff filed an application with the SSA for disability benefits under Title II of the Social Security Act, alleging disability beginning February 8, 2009. R. at 52, 119. The claim was denied on January 13, 2012 after the SSA concluded that Plaintiff's condition did not amount to a recognized disability under SSA regulations. R. at 56. Thereafter, Plaintiff filled a written request for hearing on January 24, 2012. R. at 10. Plaintiff appeared and testified at a hearing held by Administrative Law Judge ("ALJ") Arthur Patane on December 14, 2012, in Albany, New York. R. at 10, 29.

At the hearing, the ALJ explored Plaintiff's past work experience and functional capacity. R. at 33-37. Plaintiff testified that she had previously worked as a temporary worker for the New York State Department of Tax and Finance. R. at 33-34. Plaintiff held this job for about one year before she was laid off in 2009. R. at 33, 35. Plaintiff "worked all day scanning and copying tax forms" and also pulled staples from files. R. at 33, 143. Plaintiff's job also required the use of "technical knowledge or skill," and included writing, completing reports, or similar duties. R. at

155.  At work, Plaintiff sat for five hours, walked for an hour, and stood for thirty minutes.  Id.

Plaintiff also typically lifted less than ten pounds.  Id.

At some point thereafter, the state hired Plaintiff as a temporary worker again, but this time

she was expected to do computer work.  R. at 34.  Plaintiff held this position for only two weeks

because it was not a good fit for her.  Id.  Plaintiff testified that prior to her work for the state, she

had been employed to drive a minivan for twenty five to thirty hours per week for about seven years.

R. at 36.

Plaintiff testified that she suffered from arthritis, and that Dr. Dixon at Northeastern

Orthopedic had performed three surgeries on her feet.  R. at 39-40.  When asked about her arthritis,

Plaintiff testified that she has arthritis in her "pelvis, fingers, shoulder, [and] neck."  R. at 40.

Plaintiff also testified that, depending on the angle and timing, lifting even five pounds can make the

bone in her pelvis feel like it is "splitting apart."  R. at 41.  Plaintiff also testified that walking about

a quarter of a mile was too much walking.  Id.  When Plaintiff's attorney asked her if she had a

computer, she testified that computers are too confusing and that she does not understand how to

use them.  R. at 40.

Plaintiff testified that her panic attacks can be triggered by just about anything, including

thinking about death or thinking about her children getting hurt; which then results in Plaintiff

having bowel accidents.  R. at 42.  Plaintiff stated that she does not go outside much and that the

only store she feels safe in is Walmart.  Id.  Plaintiff explained that besides going to Walmart, she

only leaves the house for doctor appointments.  Id.  Plaintiff stated that she does not attend all of her

scheduled doctor appointments, depending on how she is feeling.  R. at 43.  Plaintiff explained that,

because she is bipolar, she could miss her appointments because she is high, or because she would

rather just crochet.  Id.  However, Plaintiff does not attribute this only to her bipolar disorder, but also to her anxiety medicine, because she is not allowed to drive while medicated.  Id.  Plaintiff explained that one milligram of clonazepam can incapacitate her for about eight hours.  R. at 43-44. Plaintiff added that she took a half-milligram of clonazepam in order to attend the hearing.  R. at 44. When Plaintiff's attorney asked Plaintiff why she had been fidgeting throughout the hearing, Plaintiff responded that this is a result of her anxiety, even when she is on medication.  Id.  Plaintiff testified that every time she has a panic attack and is outside of her home, she loses control of her bowels.  Id.  Plaintiff stated that this also occurs when she is in her home, and that the frequency of these episodes can range from occurring five times a week to not occurring for ten days, depending upon the efficacy of her anxiety medicine.  R. at 45.

When Plaintiff's attorney asked her what she does for fun at home, Plaintiff mentioned that she often has to re-watch her half hour shows, because she cannot pay attention for the whole half hour.  R. at 46.  Plaintiff mentioned that she has nodules on her thyroid, which make it difficult for her to turn her neck.  R. at 47.  Plaintiff testified that she had a surgery in her foot where they took out a bone and replaced it with a stent.  Id.  Plaintiff also discussed that she has urinary issues, but that she stopped pursuing help with this for personal reasons.  R. at 48.

The ALJ asked Plaintiff about her ability to perform the following tasks on a regular basis: "meals, family, socialization, pet care, self-care, some driving, shopping with daughter, money management, independent use of public transportation."  R. at 49.  Plaintiff responded that her situation gets worse as she ages, that she cannot drive if she takes clonazepam, and that she cannot take public transportation.  R. at 50.

## E.  Procedural History

The ALJ issued a decision on April 15, 2013, finding that Plaintiff had not engaged in any substantial gainful activity since February 8, 2009, the alleged onset date of her disability.  R. at 21. While the ALJ found that Plaintiff's bipolar disorder and panic disorder were severe impairments, he also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R.  Part 404, Subpart P, Appendix I.  R. at 12, 16.  The ALJ considered Plaintiff's lower back pain, foot disorder, bladder incontinence, osteoarthritis and thyroid disorder, and found that these impairments were not severe enough to be constitute a severe impairment under 20 CFR § 404.1521.  R. at 15.  While the ALJ did not "doubt that the claimant may occasionally experience symptoms" the ALJ found "no evidence that they are of such frequency, intensity, or duration as to render her incapable of performing substantial gainful activity on a sustained basis."  R. at 19.  The ALJ found that Plaintiff had the RFC to "perform a full range of work at all exceptional levels but with the following nonexertional limitations: the claimant requires a low contact setting since the claimant can only work with large groups of people occasionally."  R. at 17.  The ALJ listed several activities that Plaintiff engaged in—maintaining her home, cooking, socializing with her daughter—as well as Dr. Noia's findings that Plaintiff did not "experience significant deficits in social interactions."  R. at 17-18.  The ALJ stated that Plaintiff was capable of "performing past relevant work as a clerk."  R. at 19.  The ALJ also found that, in the alternative, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  R. at 20.  Therefore, under the standards set forth in the Social Security Act, the ALJ concluded that Plaintiff was not disabled

between February 8, 2009, the alleged onset date of disability, and April 15, 2013, the date of decision. R. at 20, 21.

## III.   LEGAL STANDARD

### A.  Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if her decision is supported by substantial evidence in the Record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if it might justifiably have reached a different result upon a de novo review.'" Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs.,

734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333 F. App'x 609, 610 (2d Cir. 2009). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed with the analysis. Id.

At step one, the SSA considers whether the claimant's current work is "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it is, the claimant is not disabled under the SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such an impairment, the claimant is not disabled under the SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. Part 404, Subpart P, Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA continues to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under the SSA standards if the RFC reveals that the claimant can perform

past relevant work.  Id.  If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id. § 404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to be disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that the ALJ committed reversible error in the following ways: (1) by failing to properly assess the opinion evidence of Plaintiff's treating mental health providers; (2) by concluding that Plaintiff could return to her past relevant work at step four; (3) by failing to properly assess Plaintiff's mental health impairments and the impact of Plaintiff's non-severe impairments when conducting his RFC analysis.  Pl. Br. at 3, 6, 8.[2]

### A.  Proper Weighing of Medical Opinions

Treating physicians' opinions are to be given controlling weight if they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the record.  Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(c)(2).  Plaintiff argues that the ALJ erred by not giving controlling weight to the medical opinions of Dr. Urresta, Plaintiff's treating physician.  Pl.'s Br. at 3.  In November 2011, Dr. Urresta and Ms. Ramsey-Cummins co-signed a psychiatric questionnaire concerning Plaintiff's mental state.  R. at 246.  In this questionnaire, Dr. Urresta opined that Plaintiff was unable to work because of anxiety, depression, panic attacks, and bowel incontinence.  R. at 251.  Plaintiff takes issue with the ALJ's conclusion that Dr. Urresta's findings should be afforded little weight because

---

[2] Citations to the parties' briefs refers to the pagination assigned by the Court's Electronic Filing System ("ECF").

his conclusions were inconsistent with the medical evidence, and that even if the ALJ properly concluded that the treatment notes did not support Dr. Urresta's findings, the ALJ should have contacted the sources for clarification, considering that the ALJ has an affirmative duty to make reasonable efforts to develop the record.  Pl.'s Br. at 3-6.

The ALJ properly accorded little weight to both Dr. Urresta and Ms. Ramsey-Cummins medical opinions because they were inconsistent with Plaintiff's medical records.  A treating physician's opinion is given "controlling weight" where it is "well-supported by medially acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  However, a treating physician's opinion "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).  Where an ALJ does not assign controlling weight to a treating physician's opinion, the ALJ must then consider the following factors in determining the appropriate weight to assign the opinion:

> The length of the treatment relationship and the frequency of examination, (ii) the nature and extent of the treatment relationship; (iii) the extent to which the opinion is supported by relevant evidence, (iv) the consistency of the opinion with the record as a whole; (v) specialization; and (vi) other factors.

20 C.F.R. § 404. 1527(c).

The ALJ accorded Dr. Urresta's opinion that Plaintiff was unable to work little weight because it was inconsistent with Dr. Urresta's own examinations of the Plaintiff and contrary to his treatment notes.  R. at 19.  On May 31, 2011, Dr. Urresta noted that Plaintiff "is friendly, attentive, [and] fully communicative."  R. at 406.  Dr. Urresta further noted that Plaintiff showed no signs of anxiety, and that Plaintiff's "[v]ocabulary and fund of knowledge indicate cognitive function in the normal range."  Id.  Dr. Urresta made similar oservations on June 21, 2011.  R. at 407-08.

16

Furthermore, Plaintiff's GAF of 65 indicates only mild difficulty in social, occupational, and psychological functioning. R. at 406. Plaintiff scored a GAF of 65 on several different occasions. R. at 406, 408, 419. Ms. Ramsey-Cummins similarly noted a GAF of 65 on January 26, 2011 and February 8, 2011. R. at 398, 400. Ms. Ramsey-Cummins also noted that Plaintiff did not show signs of anxiety, that Plaintiff's "[d]epressive symptoms appear[ed] to be in remission," and that on certain occasions, Plaintiff denied having "anxiety or depressive symptoms." R. at 397, 399, 401, 402, 404, 405, 408. Therefore, the November 2011 functional assessment cosigned by Dr. Urresta and Ms. Ramsey-Cummins is contradicted by the treatment notes of Dr. Urresta and Ms. Ramsey-Cummins.

Dr. Urresta's findings are also inconsistent with other objective medical evidence. The opinion of a consultative examiner can comprise substantial evidence in support of an ALJ's determination. See Diaz v. Shalala, 59 F. 3d 307, 315 (2d Cir. 1995); Monguer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). For example, Dr. Murray noted that Plaintiff denied suffering from depression, anxiety, mental illness, and sleep disorders. R. at 293. Dr. Noia found that Plaintiff could follow and understand simple directions and could perform "simple and some complex tasks with supervision and independently." R. at 238. Plaintiff's RFC assessment found an adequate ADLS range, and Plaintiff's CE found only moderate limitations. R. at 270. Plaintiff tries to get out of the house "at least once a week" and occasionally drives. R. at 135. Therefore, the November 2011 functional assessment cosigned by Dr. Urresta and Ms. Ramsey-Cummins is inconsistent with other medical evidence.

Plaintiff argues that the ALJ should have requested a clarification from Dr. Urresta. Pl.'s Br. at 5. While the ALJ has an affirmative duty to make reasonable efforts to develop the record, the

Court finds that the Record in the present case was adequately developed and the ALJ's decision was supported by substantial evidence.

**B. Step Four Determination**

When determining if an individual can perform past relevant work, "[a]n individual retains the capacity to perform his past relevant work when he can perform the functional demands and duties of the job as he actually performed in or as generally required by employers throughout the national economy." <u>Kempston v. Colvin</u>, No. 13-CV-1064, 2015 WL 5709012, at *11 (N.D.N.Y. Sept. 29, 2015) (Kahn, J.); <u>see also</u> <u>Jock v. Harris</u>, 651 F.2d 133, 135 (2d Cir. 1981).

The ALJ found that Plaintiff could perform the job of a clerk, as defined in the Dictionary of Occupational Titles ("DOT") and that the position of clerk was consistent with Plaintiff's past relevant work. R. at 19-20. Plaintiff first argues that the ALJ did not provide a specific DOT code, but instead equated "clerk" to the performance of light work. Pl.'s Br. at 7. Plaintiff also argues that her past relevant work is not consistent with the role of "clerk." <u>Id.</u> Plaintiff's past relevant work consisted of pulling staples, scanning and copying forms, and sorting papers. R. at 34, 143, 155. Plaintiff also reported that her previous job required her to draft reports and involved some technical knowledge. R. at 155. Plaintiff's typical work day consisted of sitting for five hours, walking for an hour, and standing for thirty minutes. <u>Id.</u> Plaintiff also typically lifted less than ten pounds. <u>Id.</u>

While the ALJ may have defined the occupation of clerk as light work in lieu of providing a specific DOT code, the Court finds that Plaintiff's past relevant work corresponds with the job of administrative clerk, DOT 219.362-010 (Administrative Clerk). Pl.'s Br. at 7; R. at 19-20, 34, 143, 155. According to the DOT, an administrative clerk's duties include compiling records, copying

18

data, and operating office machinery. DOT 219.362-010. The position does not involve significant social interaction or physical demands. Because Plaintiff's RFC is compatible with this DOT Title, Plaintiff can perform this job as generally performed in the national economy. Furthermore, this position is consistent with Plaintiff's previous experience pulling staples and sorting, scanning, and copying documents in the past. R. at 34, 143, 155. As a result, there is little reason to believe that Plaintiff's past relevant work exceeds her RFC, meaning that Plaintiff could perform her past work as she actually performed it. R. at 18-19. Therefore, the ALJ properly concluded that Plaintiff was not disabled according to step four. R. at 19-20.

### C. Step Two Analysis

Plaintiff argues that the ALJ did not properly assess Plaintiff's mental health non-exertional limitations in his RFC analysis and Plaintiff's limitations due to non-severe impairments. Pl.'s Br. at 8-10. Plaintiff first argues that the ALJ failed to include Plaintiff's mental limitations—most notably her agoraphobia and incontinence—in the RFC analysis. Id. Plaintiff also argues that the ALJ wrongly found that Plaintiff's physical limitations, in particular her bone spurs and back pain, were not severe. Pl. Br. at 10. Plaintiff argues in the alternative that even if her physical limitations were not severe, the ALJ failed to consider them in the RFC analysis. Id.

While the ALJ did not use the word agoraphobia, he discussed that Plaintiff "has bowel incontinence as a symptom of her panic attacks" and that Plaintiff "reported panic attacks and difficulty leaving her house." R. at 18-19. Furthermore, the ALJ considered Dr. Urresta and Ms. Ramsey-Cummins' findings, and as discussed above, found that they were internally inconsistent with the rest of their findings. R. at 19. Therefore, Dr. Urresta's evaluation was entitled to little weight. Id. As a result, while the ALJ did not "doubt that the claimant may occasionally experience

symptoms" the ALJ found "no evidence that they are of such frequency, intensity, or duration as to render her incapable of performing substantial gainful activity on a sustained basis." Id.

The Court finds that the ALJ correctly determined that neither Plaintiff's foot disorder or lower back pain were severe impairments. R. at 15. As for Plaintiff's foot disorders, both Dr. Prezio and Dr. Rigolosi found that Plaintiff was not in acute distress. R. at 240, 481. Dr. Prezio found that Plaintiff's gait was normal and she could walk on her heels and toes without difficulty. R. at 240. Dr. Rigolosi noted that Plaintiff could heel and toe walk effectively. R. at 481. Furthermore, on a follow up examination to Plaintiff's 2012 procedure, Plaintiff's wounds were healing well without any sign of infection. R. at 470. Also, Plaintiff was neurovascularly intact and radiographs displayed early healing as well as intact hardware and excellent alignment. Id. Therefore, the ALJ correctly determined that Plaintiff's foot disorder was not a severe impairment. As for Plaintiff's lower back pain, Plaintiff admits that "there are no specific limitations placed on her by her treating sources." Pl.'s Br. at 12. Plaintiff was able to rise "from a seated position without difficulty," her gait was "non-antalgic and reciprocal," she could "toe and heel walk," and she had "good range of motion of the cervical and lumbar spine in all planes." R. at 481. Plaintiff's palpation only suffered "mild cervical and lumbar spasm and tenderness." R. at 296. Also, Plaintiff's thoracocervical spine was properly aligned, and Plaintiff's cervical spine's disc height was well-maintained throughout. Id. However, Dr. Rigolosi did note that Plaintiff's lumbar spine had "mildly decreased disc height at L5-S1." Id. Nevertheless, Dr. Rigolosi only recommended chiropractic treatment as the next step. Id. Dr. Prezio also stated that Plaintiff's stenosis did not require surgery, and found that "there do not appear to be any significant physical limitations or

restrictions noted at the present time." R. at 239, 242. Therefore, the ALJ correctly determined that Plaintiff's lower back pain was not a severe impairment.

Plaintiff further asserts in the alternative that, even if the ALJ correctly determined that Plaintiff's foot disorder and lower back pain were non-severe impairments, the ALJ failed to consider Plaintiff's non-severe foot disorder and lower back pain in the RFC analysis. Pl.'s Br. at 11. However, the ALJ implicitly considered these when evaluating her activities of daily living, and found only mild restrictions. R. at 16. Therefore, the ALJ still considered these restrictions in the overall analysis.

## IV.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:              March 31, 2016
                    Albany, New York

_____
      Lawrence E. Kahn
      U.S. District Judge